Michael "Nick" DIAZ, et al., Plaintiffs,

v.

Roy ROMER, et al., Defendants.

Debra NOLASCO, et al., Plaintiffs,

v.

Roy ROMER, et al., Defendants.

Richard ARGUELLO, et al., Plaintiffs,

v.

Roy ROMER, et al., Defendants.

Civ. A. Nos. 77–C–1093, 90–C–340 and 88–C–1335.

United States District Court, D. Colorado.

June 12, 1992.

James Hartley, Denver, Colo., for plaintiffs.

William Higgins, First Asst. Atty. Gen., Denver, Colo., for defendants.

## ORDER

CARRIGAN, District Judge.

The matter is before the Court on the parties' joint motion for approval of the settlement agreements submitted in the above captioned cases. Because these cases involve certified classes, the Court must approve any resolution of the outstanding claims of the plaintiff classes under Rule 23(e) of the Federal Rules of Civil Procedure.

## INTRODUCTION

The proposed settlement agreements filed in these cases would settle three class action lawsuits challenging the conditions of confinement in seven Colorado prisons: Womens, Territorial, Shadow Mountain, Centennial, Fremont, Buena Vista and Arkansas Valley Correctional Facilities. In return for final closure of these cases, the defendants have agreed to make capital improvements and to undertake certain other changes at each of the subject prisons ·to insure that conditions of confinement at those facilities meet constitutional standards.

The parties submitted their joint motion for approval of the proposed settlement agreements on February 24, 1992. Pursuant to this Court's order dated March 2, 1992, notice of the proposed settlement agreement was prepared by the Clerk of the District Court. Defendants were ordered to post a copy of that notice together with the proposed settlement agreement by March 6, 1992 in every living unit and in each law library of each of the affected prisons. Counsel for the defendants have represented to the Court and submitted documentary evidence that defendants have complied with the Court's order.

Prior to the hearing on April 24, 1992, the Court reviewed the proposed agreements and all of those comments and objections received by the Clerk, whether timely filed or not. Appearing at the hearing on behalf of the plaintiff class were their attorneys of record, Messrs. James E. Hartley and Steven W. Black. Also present for the plaintiff class was Leslie Pagett, a le-

gal assistant with the ACLU. The defendants were represented by their counsel of record, Messrs. Paul Farley, Deputy Attorney General, Anthony Marquez and William Higgins, both First Assistant Attorneys General. Frank O. Gunter, Director of the Department of Corrections for the State of Colorado, was also present at the hearing. The Special Master, The Honorable Steven L.R. McNichols, was present and recommended approval of the proposed settlement agreements. Finally, the Court accepted a brief filed on behalf of "Citizens for Correctional Reform" as *amicus curiae.*

## APPLICABLE STANDARD OF REVIEW

■ Rule 23(e) of the Federal Rules of Civil Procedure provides that a class action "shall not dismissed or compromised without the approval of the court." In addition, notice of any proposed settlement must be given to all the class members "in such manner as the court directs." The purpose of these requirements is to protect class members whose rights "may not have been given adequate consideration during the settlement negotiations." *In re New Mexico Natural Gas Antitrust Litigation,* 607 F.Supp. 1491, 1497 (D.Colo.1984). To be approved by the Court, a class action settlement must be fair, adequate and reasonable to the class as whole. *See id.* (discussing factors the court may weigh in making this determination); *see also Officers for Justice v. Civil Service Commission,* 688 F.2d 615 (9th Cir.1982). However, a settlement hearing is not a substitute for a trial; the Court's role is much more limited. As explained by the Ninth Circuit Court of Appeals:

> [T]he court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole is fair, reasonable and adequate to all concerned. Therefore, the settlement or fairness hearing is not to be turned into

a trial or rehearsal for trial on the merits.... The proposed settlement is not to be judged against hypothetical or speculative measure of what might have been achieved by the negotiators.

*Officers for Justice,* 688 F.2d at 625.

■ A consensual resolution of a dispute is always preferred. Such consensus can only be founded upon compromise. Thus, the fact that the agreements reached do not address each and every issue raised in the Complaint or Motion for Contempt does not in and of itself give cause to question the fairness of the agreements or the process involved in reaching them.

With these standards in mind, the Court will assess adequacy of notice and the fairness of the proposed settlements in that order.

## ADEQUACY OF NOTICE

Members of the class were advised that a proposed settlement was submitted to this Court for approval pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, and that any inmate who wished to comment on or object to the fairness or reasonableness of the proposed settlement agreement must file a written statement with the Court postmarked no later than April 6, 1992. The Clerk of the District Court was directed to receive and file written comments and objections submitted by the inmates which, in turn, this Court has reviewed.

Noting that no comments were received from inmates at the Buena Vista Correctional Facility, the Court specifically inquired of defense counsel regarding compliance with the order requiring notice at that facility. Counsel, after consultation with Department of Corrections officials present in court, assured the Court that the notices had been posted as ordered, and plaintiffs' counsel do not dispute that adequate notice was given to inmates at BVCF.

In the only instance where adequacy of notice was contested by members of the plaintiff class, the Court admitted into evidence with no objection from counsel an affidavit from the housing manager at Col-

orado Territorial Correction Facility ("CTCF"), declaring that notice was in fact posted at CTCF from March 6, 1992, through April 6, 1992, in conformance with the Court's order. In addition, the fact that a number of inmates objected to the proposed settlements is evidence of the effectiveness of notice.

▇ Having reviewed the procedure utilized to notify class members of the terms of the proposed settlement, and having considered all of the objections of the class members, including objections to the adequacy of notice, the Court finds that class members have been duly, sufficiently and fairly notified of (1) the terms of the "Final Agreement and Stipulation" and the "Agreement for Settlement of Claims"; (2) the date, time and place of the hearing to approve final settlement; and (3) the procedure for bringing comments and/or objections concerning the proposed settlement to the attention of the Court. Accordingly, the thirty day notice and comment period provided pursuant to this Court's order satisfied the requirements of Rule 23(e) of the Federal Rules of Civil Procedure and complied with all applicable due process and other constitutional requirements.

## TERMS OF PROPOSED SETTLEMENTS

The Court accepts both of the agreements as negotiated and written, without modification or exception. By its comments hereafter the Court does not intend to modify the terms of these agreements.

### Diaz v. Romer, Civil Action No. 77-C-1093

The "Final Agreement and Stipulation" submitted in *Diaz* is a comprehensive agreement contemplating the final closure of a case that began almost 15 years ago (originally *Ramos v. Lamm*). In return for the immediate dissolution of all previous orders of the Court in this action, and the withdrawal of plaintiffs' pending motion to show cause why defendants should not be held in contempt, defendants have agreed to make capital improvements and to undertake other steps, most notably staffing increases, at the affected prisons no later than June 30, 1994. Except for the limited purpose of enforcing the terms of the settlement agreement, this case will be closed in its entirety and the Court's jurisdiction over the parties will end. For the reasons discussed below, the Court finds that resolution of this proceeding, as set forth in the proposed Final Agreement and Stipulation, is in the best interests of the class members and the ongoing intervention and supervision by the Court is no longer necessary.

This proceeding was originally initiated as an action under 42 U.S.C. § 1983 challenging the conditions of confinement at the facility presently known as Colorado Territorial Correctional Facility ("CTCF"). This matter was certified as a class action on March 31, 1978, in accordance with Rule 23 of the Federal Rules of Civil Procedure. The class now consists of all persons who are now or in the future may be incarcerated at CTCF, Centennial Correctional Facility ("CCF"), or Shadow Mountain Correctional Facility ("SMCF").

After trial the Court found that the conditions of confinement at CTCF violated the Eighth Amendment's prohibition against cruel and unusual punishment. *See Ramos v. Lamm*, 485 F.Supp. 122 (D.Colo.1979), *aff'd in part and rev'd in part*, 639 F.2d 559 (10th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981), *on remand*, 520 F.Supp. 1059 (D.Colo. 1981). To remedy the unconstitutional conditions, the Court directed the state defendants to implement certain changes in the operations of the prison. For the protection of the class, the Court's orders were made applicable to the three facilities presently at issue.

After a series of early remedial orders, the parties entered into a Consent Order dated August 7, 1985 requiring the defendants to comply with numerous provisions in the operation of the three facilities. At the time of entry of that order, it was the intent of the parties and the Court that, "Provided that defendants are substantially in compliance herewith, this consent order, and defendants' obligations hereunder, shall terminate, and the case shall be

deemed closed, 18 months after the order is entered by the Clerk of the Court" (para. 1(c), p. 2 of 1985 Consent Order). In determining whether the purposes of that Order have been achieved, the Court must consider the parties' intent when the consent decree was entered. *Kendrick v. Bland,* 659 F.Supp. 1188 (W.D.Ky.1987). The parties having initially agreed to the terms of a consent decree, great weight should be given to a subsequent agreement of those parties that the purposes of the original decree have been accomplished.

Since the entry of the 1985 Consent Order, plaintiffs, through class counsel, have continued to investigate and monitor conditions at the three facilities, and defendants' compliance with the Court's orders. For example, in late 1986 and early 1987 plaintiffs arranged for certain experts to inspect the three facilities in order to evaluate defendants' compliance with the Court's directives. In late 1988 and early 1989, plaintiffs conducted substantial discovery, including document production and depositions of Department of Corrections personnel, regarding the issue of the defendants' compliance with the Court's directives. Joint experts in the areas of security, physical plant conditions, mental health, and medical and nursing care have inspected the three *Ramos* facilities semi-annually to monitor conditions of confinement and evaluate compliance with the consent decrees. Finally, plaintiffs have conducted substantial additional discovery in connection with their contempt motion filed in early 1990. Class counsel have thoroughly investigated their case and clearly are in the position to evaluate the risk of further litigation compared to the benefits to the plaintiff class offered in settlement.

Furthermore, since this matter was assigned to this Court approximately 5 years ago, this Court has had occasion to decide disputes arising in the context of this action (*i.e.,* housing of HIV positive inmates, order of Sept. 12, 1990). By virtue of this contact the Court has become personally familiar with the operations of the Department of Corrections as a whole, these three facilities in particular, and the policies and staff involved. This Court has also had numerous opportunities to observe and assess the legal skill and acumen of class counsel during these various proceedings and is confident that these class members have received competent representation in this action.

The proposed settlement addresses many of the concerns identified in the plaintiffs' contempt motion and contemplates the conclusion of court supervision. Among other things, the defendants have agreed to hire a full-time medical director and an additional full-time psychiatrist; hire 48 additional correctional and health care staff; renovate Cell House 3 at CTCF; refrain from double bunking at CCF and SMCF for a minimum of 2 years; institute double bunking at CTCF only if additional staff are hired to provide supplemental activities and services; establish a "CMI Unit" at CCF to provide mental health care for chronically mentally ill inmates. These benefits will inure to the benefit of class members at all three of the *Diaz* facilities. The Court agrees with the parties that the purposes of the previous Court orders have been achieved and no need exists to continue judicial supervision of the three *Diaz* facilities.

### *Nolasco v. Romer,* Civil Action No. 90–C–340, and *Arguello v. Romer,* Civil Action No. 88–C–1335

These class action lawsuits challenge the conditions of confinement at four Colorado state prisons. The *Nolasco* case alleges unconstitutional conditions at Colorado Womens Correctional Facility, Buena Vista Correctional Facility and Fremont Correctional Facility (the "Three Prisons," or respectively, "CWCF," "BVCF" and "FCF"). The *Arguello* case alleges similar unconstitutional conditions at Arkansas Valley Correctional Facility ("AVCF"). The plaintiffs have twice amended their complaints and the defendants have twice answered. The plaintiff classes have been certified by the Court and the cases consolidated.

Unlike the *Diaz* case, the *Nolasco* and *Arguello* actions have *not* proceeded to trial. No evidence has been heard or ruling made determining that conditions at the

*Nolasco* and *Arguello* prisons are unconstitutional. Therefore, when evaluating the benefits of the settlement in these cases, it is necessary to consider the very real possibility that plaintiffs might not be successful at trial. Not only must class counsel thoroughly investigate facts, they must be alert to new interpretations of the parties' legal responsibilities. For example, while this action was pending the Supreme Court issued its decision in *Wilson v. Seiter,* —— U.S. ——, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991), considering again the essential showing a prisoner must make in claiming that the conditions of his confinement violate the Eighth and Fourteenth Amendments.

In preparation for trial, the parties have engaged in substantial discovery, including consultation with a number of expert witnesses, to assess the conditions at the Three Prisons and the AVCF. The plaintiffs' experts are knowledgeable in their respective fields of prison conditions, have toured the facilities in question, and have had the opportunity to review pertinent documents regarding the physical conditions and the operation of the prisons.

Over the past several years the State has spent millions of dollars to renovate the physical facilities at the Three Prisons and the AVCF, including the renovation of entire cell houses, extensive asbestos removal, and the replacement of electrical, fire prevention, heating and ventilation systems. These steps already taken by the defendants, together with those contemplated in the proposed settlement agreement, should ensure that conditions at the subject prisons meet constitutional standards. The Court finds that resolution of the plaintiffs' claims, as set forth in the proposed "Agreement for Settlement of Claims," is fair, reasonable and in the best interests of the class members and is preferable to a trial.

## NEGOTIATION OF THE SETTLEMENTS

■ The settlement agreements are the product of difficult and arms-length negotiations among the attorneys for the parties. Class counsel are experienced in litigation challenging conditions of confinement in prisons, having represented plaintiffs in these and dozens of other cases over the past 15 years. Colorado counsel for the class have been assisted in their negotiations and evaluation of conditions of confinement at the various prisons, not only by the experts retained in this case, but also by experts in the field of prison rights litigation working with the National Prison Project of the American Civil Liberties Union.

The Court has also relied upon the services of a Special Master in this case, The Honorable Steven L.R. McNichols. Governor McNichols is a former governor of the State of Colorado and has consulted with the State Parole Board for several years. He has intimate familiarity with the issues raised in these cases and conditions of confinement at the prisons. Governor McNichols appeared at the settlement hearing and urged the court to approve the proposed settlement agreement.

Once the proposed settlement agreement was negotiated by the attorneys, the terms of the proposed agreements were conveyed to representative members of the plaintiff class, including prisoners at each of the prisons involved in the cases. Class counsel met in person with representative members of the class and discussed the terms of the settlement agreement at length. Subsequent to those meetings, certain changes were made in the proposed agreements to reflect concerns raised by the prisoners.

Based upon this evidence of the negotiation process, the Court finds that the settlement agreements were negotiated in good faith. Class counsel were skilled and experienced, and representative members of the class had an opportunity to comment on the proposed settlement agreements before they were finalized.

## RESPONSE TO INMATE OBJECTIONS

Relatively few complaints and comments have been received in response to the notice, considering the size of the class and the fact that seven medium and high security facilities are involved. Considering the breadth of the issues involved, the compar-

atively low number of inmate objections is itself some indication that the agreements are reasonable for the class as a whole. The Court has carefully reviewed all of those objections and addresses them collectively as follows.

A. *Overcrowding and Double Bunking*

The most common objection was that the facilities were overcrowded and that double bunking should be specifically prohibited. The inmates of the *Nolasco* class sought the elimination of double bunking and the *Diaz* inmates, especially those at Colorado Territorial Correctional Facility, objected to the removal of the population cap, which has effectively prohibited double bunking at that facility. The Court recognizes that prison overcrowding may be responsible for deficiencies in other core constitutional areas such as medical, dental and mental health care; food; clothing; shelter and sanitation standards; personal and fire safety; and access to the courts. It was in these areas that the defendants were alleged to have violated the class members' rights and it was these issues which class counsel have thoroughly investigated.

Since *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), double bunking in and of itself does not constitute cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. Thus, although the inmates may find double bunking undesirable and even unpleasant, the Court agrees with the conclusions expressed by class counsel, based on the reports of their experts and their own investigations, that the double bunking permitted under the proposed settlement agreements will not offend the Constitution under the circumstances of this case. Furthermore, the Court finds that the notable increase in the number of staff positions at each of the *Diaz* facilities should promote a corresponding increase in the availability of programs, thereby diminishing the tensions associated with inactivity.

B. *Medical and Dental Treatment*

A second theme of the inmates' comments and objections concerned medical and dental services. In some respects these comments raised issues personal to individual inmates or stated a concern that these services may deteriorate in the future.

Concerning the *Diaz* class, the Court is persuaded that the defendants have addressed the problems with medical and dental treatment that led to the court's intervention in the first place. *Ramos v. Lamm*, 485 F.Supp. at 142–44. This progress, together with the changes contemplated in the settlement agreement, demonstrate a commitment by the defendants to provide medical and dental care at the prisons that is consistent with minimum constitutional standards.

The 1985 Consent Order incorporated a health care plan that provided for a certain level of services at each of the *Diaz* facilities and, significantly, for the separation of security and clinical responsibilities within the Department. The defendants have committed to working for a continuation of this centralization of health services in the clinical services division of the DOC. Furthermore, the defendants have agreed to hire, and have already hired, a full-time medical director and an additional full-time psychiatrist for the Department. These changes should help to ensure adequate medical and dental care, and should inure to the benefit of all of the class members.

C. *Mental Health Care*

In resolution of these actions, the defendants have agreed to establish CMI Units at CCF and AVCF. The defendants have agreed to add the additional staff necessary to provide a therapeutic environment for CMI inmates. The principal inmate complaint with respect to these CMI Units is that they will be improperly operated in the absence of court supervision. The Court finds that the agreement to resolve the inmates' claims regarding this issue by the provision of the CMI units provided for in the agreements and their attachments is a fair and reasonable resolution of existing claims. Fears regarding possible violations sometime in the future are not cause to reject these settlements. In any event, class counsel have assured the Court that they will not hesitate to intervene if the

programs are not operated in accordance with the program descriptions (*see* attachment "B" to the *Diaz* Settlement Agreement; attachment "G" to the *Nolasco* Settlement Agreement).

### D. *Sex Offender Treatment Programs*

The Agreement for Settlement of Claims obligates the defendants to provide or continue to provide all eligible sex offenders access to sex offender treatment at the levels set forth in Attachment E. The inmates' principal complaint concerns the possibility for self-incrimination through the required disclosures made in connection with sex offender treatment. However, the settlement agreement does not create a waiver of any existing privilege. Paragraph 11 of the settlement agreement makes clear that "any and all admissions or statements made by inmates concerning wrongful sexual behavior while participating in or applying for admission into any sex offender program will be considered to be a part of a confidential medical record *and a privileged communication* as *provided by statute.*" (emphasis added).

### E. *Non–Binding Peer Review*

The provision in the proposed settlement agreements permitting non-binding peer review plainly constitutes a negotiated compromise. Although the defendants may not have been willing to submit to binding peer review, the Court agrees with class counsel's assessment that even a purely advisory peer review will have a salutary effect on the operation of these prisons.

### F. *Food Service*

The Court takes seriously all complaints concerning the preparation and delivery food. It is clear that safe and wholesome food is critically important to the health, dignity and well-being of inmates as well as staff. The defendants have agreed to take concrete steps to improve food service in the subject facilities, such as the replacement of food carts and the renovation of the old kitchen at BVCF. The Court also notes that regular and on-going inspections by the Colorado Department of Health will ensure that food service facilities meet minimum constitutional standards at all times.

### G. *Legislative Funding*

The Court recognizes that the proposed settlement agreements are contingent on appropriate legislative funding. This fact of constitutional government is not a reason for withholding approval of the proposed settlements. The agreements specifically provide that if legislative funding is not forthcoming, either party may withdraw its consent to the agreement and resume a litigation posture.

### H. *Two–Year Period of Compliance*

The two-year period of compliance in the proposed settlement agreements plainly is the product of a negotiated compromise. The defendants no doubt were willing to make concessions in some areas in return for a shorter compliance period.

### I. *Fears of Future Violations by the Defendants*

Underlying all of the objections from members of both classes is the fear that the defendants may, sometime in the future, confine the class members in conditions that violate their constitutional rights. Given the experience of the *Diaz* class, such apprehension is understandable. However, the Court is impressed less by the events of the 1970's than by those of the 1980's. If the 1970's ended with a ruling that the rights of the inmates at "Old Max" had been violated, the 1980's are a record of the state's efforts to comply with this Court's remedial orders. As recounted above, class counsel have been most vigilant in ensuring that the remedial orders have been obeyed.

The last decade has also been marked by a rapid growth in prison population and a similar growth in state expenditures for both prison construction and prison operation. These expenditures have been devoted not only to new facilities but also existing ones, including those at issue here, and these agreements contemplate yet more. Financial expenditures alone do not absolve the defendants from liability, but the willingness to devote these resources is seen as a concrete indication that the defendants are prepared to accept their responsibility to the plaintiffs.

The Court also notes that the Legislature has a new approach to the sentencing of convicted felons, one that recognizes that there must be a commitment of financial resources concomitant with an increase in criminal sentences. In the 1991 legislative session, the General Assembly passed § 2-2-703, C.R.S. requiring that body to address the fiscal impact of felony sentences before bills increasing sentences are passed by the respective Houses. As represented by defense counsel, the General Assembly has applied that law on a number of occasions during this most recent legislative session. The Court further notes that the General Assembly has already passed and the Governor signed the state funding bill for the upcoming fiscal year, which includes funding for the first year's commitments under these agreements.

It is clear that great strides have been taken in the past 10 years to improve conditions at the State's prisons. Under the circumstances, the Court does not think that further court supervision is warranted, particularly in light of the evolving legal standards for institutional reform litigation. *Compare Board of Education of Oklahoma City Public Schools v. Dowell,* 498 U.S. 237, 111 S.Ct. 630, 112 L.Ed.2d 715 (1991) *with Battle v. Anderson,* 708 F.2d 1523 (10th Cir.1983), *cert. denied,* 465 U.S. 1014, 104 S.Ct. 1019, 79 L.Ed.2d 248 (1984). *See also Rufo v. Inmates of Suffolk County Jail,* —— U.S. ——, 112 S.Ct. 748, 116 L.Ed.2d 867 (1992).

## CONCLUSION

The Court finds and concludes that the "Final Agreement and Stipulation" in *Diaz* and the "Agreement for Settlement of Claims" in *Nolasco* and *Arguello* are fair, adequate and reasonable and in the best interests of the class as a whole. The Court further finds and concludes that the class members received adequate notice of the proposed settlements pursuant to Rule 23(e) of the Federal Rules of Civil Procedure. Accordingly, the agreements are *APPROVED* in their entirety and without modification in conformance with Rule 23(e) of the Federal Rules of Civil Procedure.

It is therefore ORDERED: the Final Agreement and Stipulation in *Diaz* and the Agreement for Settlement of Claims in *Nolasco* and *Arguello* are approved pursuant to Rule 23(e) of the Federal Rules of Civil Procedure. Subject to the provisions of the "Settlement of Claims" entered in *Nolasco* and *Arguello,* and upon the stipulation of the parties, the Complaint and Amended Complaints in *Nolasco* and *Arguello* are hereby dismissed with prejudice. Subject to the provisions of the Final Agreement and Stipulation entered in *Diaz,* and upon the stipulation of the parties, all previous orders of the Court in *Diaz* are hereby dissolved and are no longer effective. Plaintiffs' Motion to Show Cause why defendants should not be held in contempt is withdrawn. The parties are ordered to carry out the respective terms of the Final Agreement and Stipulation in *Diaz* and the Agreement for Settlement of Claims in *Nolasco* and *Arguello.*

This Order terminates the litigation between the parties on the merits and leaves nothing to be done but to ensure performance by the parties as they have agreed, apart from such collateral orders as may be necessary to rule on an attorneys' fees petition. This Court retains jurisdiction for the limited purpose of issuing such collateral orders, but such reservation shall not affect the finality of this Order which is hereby entered on the merits under Rule 41(a)(2) of the Federal Rules of Civil Procedure.

This Court hereby expressly finds that there is no just reason for delay and accordingly DIRECTS the Clerk of the Court to enter Final Judgment and dismissal with prejudice in *Diaz,* No. 77–C–1093, *Nolasco,* No. 90–C–340, and *Arguello,* No. 88–C–1335.

Plaintiffs shall have until July 15, 1992 to submit their petition for an award of attorneys' fees and costs relating to this matter.